# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DAVID LEE TAYLOR,**

      **Petitioner,**

**v.**                            **Case No. 8:22-cv-771-MSS-NHA**

**SECRETARY, DEPARTMENT OF
CORRECTIONS,**

      **Respondent.**

_____

## ORDER

    David Lee Taylor petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state-court convictions for second-degree murder and aggravated assault. After reviewing the second amended petition (Dkt. 13), the response (Dkt. 15), and the relevant state-court record (Dkt. 8-2), the Court **DENIES** the second amended petition.

## I.    BACKGROUND

    On the evening of October 5, 2010, Taylor was selling drugs and playing dice on a street corner in Sarasota, Florida. (Dkt. 8-2, Ex. 10, at 275, 277) The corner was part of his "territory." (Id. at 278) A car pulled up to purchase drugs. (Id. at 280) Trevoris Thomas, a friend of Taylor's, "went to the car and tried to make a sale." (Id. at 247, 280) Taylor "came up behind" Trevoris[1] and said, "[Y]ou're not going to be

---

[1] Several persons involved in this case share last names. To avoid confusion, the Court frequently refers to these persons by their first names. No disrespect is intended.

selling over here. Get off my block." (Id.) The two "had words." (Id.) Taylor pulled out a handgun and "shot at [Trevoris] . . . four or five times." (Id.) None of the bullets struck Trevoris, who was unarmed. (Id. at 281) Trevoris fled the scene; Taylor resumed gambling. (Id. at 284, 329)

Approximately ten minutes later, Trevoris's cousin Curtis Thomas arrived at the street corner. (Id. at 288) Curtis got out of his car and said, "David Taylor, why were you shooting at my cousin?" (Id. at 285-86) The two "had words," and Curtis asked to "fight" Taylor. (Id. at 286) Taylor said, "[Y]ou don't fight," then pulled out his gun and shot Curtis twice in the abdomen. (Id. at 286, 435-46) Taylor fled the scene. (Id. at 290) Channing James, another of Curtis's cousins, witnessed both shootings along with his wife, Yomika James. (Id. at 280, 286, 328-31) Channing drove Curtis to the hospital, where Curtis ultimately died of his wounds. (Id. at 290, 444-45)

Trevoris, Channing, and Yomika initially refused to cooperate with law enforcement. (Id. at 258, 291, 333-34) Trevoris explained that he was not "raised" to cooperate with the police. (Id. at 258-59) Channing "didn't feel like saying anything about it at the time." (Id. at 291) And Yomika worried that testifying would endanger her "teenage daughters." (Id. at 334) At trial, however, Trevoris testified that Taylor shot at him, and Channing and Yomika identified Taylor as the culprit in both shootings. (Id. at 254, 280, 286, 328-31) Channing received a deal from the prosecution for his testimony. (Id. at 269) In exchange for testifying, he was sentenced to two years

of "house arrest" for armed robbery, fleeing to elude law enforcement, and arson. (Id. at 270)

Law enforcement recovered several items from the crime scene, including .9mm shell casings, cigar butts, a blue plastic cup, and a beer bottle. (Id. at 358, 370, 390) Taylor left his DNA on the cup and the bottle. (Id. at 460-61, 462-63) Relevant to this inquiry, the cigar butts were not tested for DNA.

Taylor was arrested and charged with second-degree murder and aggravated assault. (Id., Ex. 3) The jury found him guilty as charged. (Id., Ex. 12) He received concurrent sentences of life imprisonment for second-degree murder and five years' imprisonment for aggravated assault. (Id., Ex. 16) Following an unsuccessful direct appeal, Taylor moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Id., Exs. 22, 24-26) The postconviction court denied relief, and the appellate court affirmed. (Id., Exs. 27, 29, 33) This federal habeas petition followed. (Dkts. 1, 12, 13)

## II.    LEGAL STANDARDS

### A.    AEDPA

Because Taylor filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), AEDPA governs his claims. Lindh v. Murphy, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was

adjudicated on the merits in State court proceedings unless the adjudication of the claim—

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Clearly established federal law refers to the holding of an opinion by the United States Supreme Court at the time of the relevant state-court decision. Id. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility of fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

### B. Ineffective Assistance of Counsel

Taylor asserts ineffective assistance of counsel—a difficult claim to sustain. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Id.</u> at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Id.</u> at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Id.</u>

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." <u>Id.</u> at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> A reasonable probability is a "probability

sufficient to undermine confidence in the outcome." Id. at 694.

Strickland cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690-91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. White v. Singletary, 972 F.2d 1218, 1220-21 (11th Cir. 1992).

Because the standards under Strickland and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" Nance v. Warden, Ga. Diag. Prison, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The appellate court summarily affirmed the denial of postconviction relief. (Dkt. 8-2, Ex. 33) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). Because the postconviction court provided reasons for denying Taylor's claims in written orders, (Dkt. 8-2, Exs. 27, 29), this Court evaluates those reasons under § 2254(d).

III.    DISCUSSION

A.    Ground One—Failure to Test Cigar Butts

Taylor argues that trial counsel was ineffective for failing to arrange for DNA testing of the cigar butts recovered from the crime scene. (Dkt. 13 at 5; Dkt. 8-2, Ex. 24, at 8) According to Taylor, the cigar butts would not have had his DNA on them. (Dkt. 8-2, Ex. 24, at 9) He contends this negative finding allegedly would have allowed the jury to acquit Taylor or convict him of a "lesser offense." (Id.) Relatedly, Taylor faults counsel for (1) not objecting to the State's "deliberate[ ]" failure to "test[] [the] cigar butts," and (2) neglecting to ask the trial court to bar the jury from hearing about the cigar butts. (Dkt. 13 at 5)

The postconviction court rejected this claim for lack of "prejudice." (Dkt. 8-2, Ex. 29, at 3) It held that, "even assuming a test of the cigar butt swab showed the absence of [Taylor's] DNA, there [was] no reasonable probability that presentation of this evidence would have changed the result of the trial." (Id.) As the court explained, Taylor's "DNA was found on the blue plastic cup and beer bottle collected from the crime scene." (Id.) Moreover, "three eyewitnesses"—Trevoris Thomas, Channing James, and Yomika James—"identified [Taylor] as the shooter." (Id.) Thus, Taylor "fail[ed] to establish prejudice under Strickland." (Id.)

The rejection of this claim was reasonable.[2] "The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the

_____

[2] Respondent contends that this claim is unexhausted, but the Court need not reach that issue because

7

outcome at trial would have been different." <u>Reed v. Sec'y, Fla. Dep't of Corr.</u>, 767 F.3d 1252, 1261 (11th Cir. 2014). "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Strickland</u>, 466 U.S. at 693. Instead, "counsel's errors [must be] so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> at 687. "Applying AEDPA to <u>Strickland</u>'s prejudice standard, [this Court] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Taylor]—that there was no substantial likelihood of a different result—was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." <u>Mungin v. Sec'y, Fla. Dep't of Corr.</u>, 89 F.4th 1308, 1317 (11th Cir. 2024).

Taylor cannot meet this demanding standard. Even if the cigar butts did not contain his DNA, there is no "reasonable probability" that "the outcome at trial would have been different." <u>Reed</u>, 767 F.3d at 1261. Approximately "ten" people were on the street corner when the shootings took place. (Dkt. 8-2, Ex. 10, at 273) As the postconviction court explained, Taylor left his DNA on two items recovered from the scene—a plastic cup and a beer bottle. (<u>Id.</u> at 460-61, 462-63) Moreover, Trevoris, Channing, and Yomika identified Taylor as the shooter. (<u>Id.</u> at 254, 280, 286, 328-31) Thus, even if Taylor's DNA were absent from the cigar butts, that finding would not prove he was somewhere else during the shootings. At most, it would suggest that he may not have handled the cigar butts. Accordingly, "[g]iven the other evidence of

---

it fails on the merits. <u>See</u> <u>Dallas v. Warden</u>, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

guilt," Taylor cannot show a "substantial" likelihood of a different outcome had the jury heard his DNA was not on the cigar butts.[3] Austin v. Sec'y, Dep't of Corr., 730 F. App'x 760, 764 (11th Cir. 2018).[4]

Furthermore, counsel had no basis to object to the State's failure to test the cigar butts. The "police do not have a constitutional duty to perform any particular tests" on evidence recovered from a crime scene. Arizona v. Youngblood, 488 U.S. 51, 59 (1988); see also Armijo v. Tapia, 288 F. App'x 530, 533 (10th Cir. 2008) (rejecting petitioner's "incorrect assumption that the state had an obligation under the Constitution to provide DNA analysis" of evidence); United States v. Marrero, 904 F.2d 251, 261 (5th Cir. 1990) (the constitution "does not place any burden upon the Government to conduct a defendant's investigation or assist in the presentation of the defense's case"); Dawkins v. New York, No. 08-cv-2441-NGG, 2011 WL 3625150, at *6 (E.D.N.Y. Aug. 16, 2011) ("[Petitioner] also argues that appellate counsel should have claimed that the People violated his rights by not running fingerprint tests on the plastic ties. However, the police do not have a constitutional duty to perform any particular tests."). Thus, counsel was not deficient for failing to raise Taylor's meritless objection. See Freeman v. Atty. Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) (noting that "[a] lawyer cannot be deficient for failing to raise a meritless claim").

---

[3] Likewise, Taylor suffered no prejudice from the jury learning that cigar butts were recovered from the scene. The prosecution did not present any evidence about forensic testing of the cigar butts. Thus, even if the jury had not learned of their recovery from the crime scene, there is no "reasonable probability" that "the outcome at trial would have been different." Reed, 767 F.3d at 1261.

[4] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R. 36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

**B.    Ground Two—Failure to Object to and Adequately Impeach Yomika James's Testimony**

Taylor faults trial counsel for not moving to "prevent" Yomika James from testifying based on her prior convictions and "inconsistent statements" about the shootings. (Dkt. 13 at 7; Dkt. 8-2, Ex. 24, at 5, 15) Before trial, Yomika claimed that (1) she did not "actually see the shooting of Curtis Thomas" or Trevoris Thomas, and (2) her husband Channing James was not present when the first shooting took place. (Dkt. 8-2, Ex. 10, at 333-34, 337-38) At trial, Yomika testified that she and Channing witnessed both shootings. (Id. at 323-32, 339-40) Taylor argues that counsel should have used these inconsistencies and Yomika's prior convictions to "disqualif[y]" her from testifying at trial. (Id., Ex. 24, at 15) Additionally, he contends that counsel failed to "properly impeach[ ]" her on these points. (Id., Ex. 25, at 10)

The postconviction court rejected this claim. (Id., Ex. 27, at 5-6) It began by noting that Taylor "incorrectly presume[d] a legal mechanism exists for the outright exclusion of witnesses who arguably lack credibility." (Id. at 5) Citing Florida law, the court explained that "[d]etermining the credibility of a witness is within the province of the trier of fact[,] and in the setting of a pre-trial motion *in limine*, it would be inappropriate for the trial court to exclude a witness on that basis." (Id.) Thus, "although prior inconsistent statements and evidence of bias are primary tools for impeaching the credibility of trial witnesses, they are not a basis for excluding testimony in advance of trial." (Id.) Because a motion to "prevent" Yomika from

testifying "would have been fruitless, defense counsel was not ineffective by failing to seek [her] exclusion" as a witness. (Id.)

Next, the court found that Yomika's "credibility" was "adequately impeached with [her] criminal record[ ]" and "prior inconsistent statements." (Id.) As the court noted, the jury learned of Yomika's "felony convictions" and "her other convictions for crimes of dishonesty." (Id. at 6) Moreover, Yomika acknowledged on direct examination that "she earlier stated that she did not see [Taylor] shoot Curtis Thomas and that Channing [ ] was at Moore's Grocery Store at the time of the [first] shooting." (Id.) Likewise, on cross-examination, "counsel impeached Yomika . . . with her earlier deposition testimony that she did not see [Taylor] shoot at Trevoris Thomas and she did not see [Trevoris] run away from the scene." (Id.) Finally, Yomika was "impeached with her earlier statement to police that Channing [ ] was not present for either shooting." (Id.) The court concluded that, "[o]n this record," counsel "did not perform deficiently with regard to impeachment of" Yomika. (Id.)

This ruling was reasonable. First, counsel was not deficient for failing to "prevent" Yomika from testifying. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective assistance] claim . . . turns on state law." Pinkney v. Sec'y, DOC, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The postconviction court held that, as a matter of Florida law, any motion to "prevent" Yomika from testifying "would have been fruitless." (Dkt. 8-2, Ex. 27, at 5) Thus, the postconviction court "already has told us

11

how the issue[ ] would have been resolved under Florida state law had [counsel] done what [Taylor] argues [she] should have done." Herring v. Sec'y. Dep't of Corr., 397 F.3d 1338, 1354-55 (11th Cir. 2005). That determination is binding on federal habeas review. See Savicki v. Jones, No. 5:17-cv-18-MCR-EMT, 2018 WL 7893046, at *31 (N.D. Fla. July 9, 2018) (federal court "must defer" to state court's determination that counsel had no "meritorious basis to object to the [] victim's competency to testify"), adopted by 2019 WL 1440913 (N.D. Fla. Mar. 31, 2019).

Because the postconviction court "authoritatively decided as a matter of [Florida] law" that the proposed objection would have failed, the remainder of the analysis is straightforward. Calhoun v. Warden, Baldwin State Prison, 92 F.4th 1338, 1351 (11th Cir. 2024). It is well established that "[a] lawyer cannot be deficient for failing to raise a meritless claim." Freeman, 536 F.3d at 1233. Therefore, the postconviction court reasonably concluded that counsel was not deficient for failing to pursue Taylor's meritless argument.

Second, the postconviction court did not act unreasonably in finding that counsel adequately impeached Yomika. "The pivotal question is whether the state court's application of the Strickland standard was unreasonable," which is "different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Thus, to prevail on his ineffective assistance claim, Taylor must "show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." Franks v. GDCP Warden, 975 F.3d 1165, 1176 (11th Cir. 2020).

Taylor cannot make this showing. As the postconviction court explained, counsel vigorously impeached Yomika with her prior inconsistent statements. For example, counsel confronted her with deposition testimony in which she denied "witness[ing] [Taylor] shooting or anyone shooting at Trevoris." (Dkt. 8-2, Ex. 10, at 337-38) Likewise, after confirming that Yomika's testimony was "now" that she saw Trevoris "running away," counsel pointed to her deposition testimony that she "didn't actually witness Trevoris running anywhere." (Id. at 338-39) Counsel also elicited an admission from Yomika that, contrary to her trial testimony, she did not tell the police that Channing "was present for both shootings." (Id. at 339-40) Furthermore, the jury heard that Yomika had nine felony convictions and nine convictions of crimes "involving dishonesty or false statement[s]." (Id. at 321) In these circumstances, a fairminded jurist could conclude that counsel's conduct did not "amount[ ] to incompetence under prevailing professional norms." Hittson v. GDCP Warden, 759 F.3d 1210, 1248 (11th Cir. 2014). Therefore, the postconviction court reasonably rejected this claim.

### C.    Ground Three—Failure to Seek Dismissal of Information

Taylor argues that trial counsel provided ineffective assistance by failing to "seek dismissal of the charging information." (Dkt. 13 at 8) According to Taylor, the information was deficient because it failed to state "where the offense happened." (Id.) The postconviction court rejected this claim. (Dkt. 8-2, Ex. 27, at 7) As it pointed out, the information read as follows: the "State Attorney of the Twelfth Judicial Circuit of the State of Florida, . . . prosecuting for the State of Florida in the Circuit Court in and

for the County of Sarasota, Florida, under oath [alleges] that [Taylor], . . . on or about October 6, 2010, *in the County and State aforesaid*," committed the charged offenses. (Id., Ex. 3 (emphasis added)) Citing Florida law, the court held that this language was "legally sufficient to allege the place of the commission of the offenses."[5] (Id., Ex. 27, at 7) Because "the information . . . was not defective, a motion to dismiss it would have been unavailing." (Id.) Thus, the court held that counsel was not "ineffective for failing to file a fruitless motion." (Id.)

This ruling was reasonable. Taylor's ineffective assistance claim "turns on [an issue of] state law"—whether the information adequately alleged venue. Pinkney, 876 F.3d at 1295. The postconviction court found that a motion to dismiss on this basis would have been "fruitless." (Dkt. 8-2, Ex. 27, at 7) That determination is binding on federal habeas review. See Kennedy v. Crews, No. 3:12-cv-243-LC-CJK, 2014 WL 1632252, at *23 (N.D. Fla. Mar. 18, 2014) ("[T]his court will not 'second guess' the Florida state courts' conclusion that the information met the requirements of Florida law."), adopted by 2014 WL 1613933 (N.D. Fla. Apr. 21, 2014). Therefore, the postconviction court reasonably concluded that counsel did not provide ineffective assistance by failing to file a meritless motion.[6] See Holt v. Sec'y, Dep't of Corr., No.

---

[5] Specifically, the court cited Sampson v. Wainwright, 394 So. 2d 581 (Fla. 5th DCA 1981), a state-court habeas action. Sampson held that an information adequately pled the "place of the commission of the crime" by alleging that "petitioner 'of the County of Lake, and State of Florida, on the 14th day of June, in the Year of our Lord One Thousand Nine Hundred and seventy-eight, in the County and State aforesaid' committed the crime charged." 394 So. 2d at 581.

[6] To the extent that Taylor refers to his conflict-of-interest claim in Grounds Two and Three of the second amended petition, the Court fully addresses this claim below in its discussion of Ground Four.

8:19-cv-2730-SDM-TGW, 2023 WL 2044771, at *23 (M.D. Fla. Feb. 16, 2023) ("Whether the indictment alleged sufficient facts to charge a crime is an issue of state law, and a state court's determination of state law receives deference in federal court.").

### D. Ground Four—Conflict of Interest

Lastly, Taylor argues that his Sixth Amendment rights were violated because trial counsel labored under a conflict of interest. (Dkt. 13 at 10) Before Taylor was arrested, the Public Defender's Office "moved to furlough [from jail] the brother of the decedent victim (Curtis Thomas) . . . so that the brother [could] attend the victim's funeral." (Dkt. 8-2, Ex. 27, Attachment 5) Counsel, a public defender, "had contact with the Thomas family regarding funeral arrangements." (Id.) According to Taylor, counsel also attended the funeral. (Dkt. 13 at 10) The conflict issue came up at a pretrial hearing. (Dkt. 8-2, Ex. 27, Attachment 6) Counsel flagged her work for the Thomas family as a "potential conflict" and said that she had already discussed the matter with Taylor. (Id. at 2, 5) Counsel did not ask to withdraw from the case, and Taylor informed the court that he had no questions. (Id. at 5-7) The court indicated that it would address the matter later "if we need to do anything," but the issue never came up again on the record, and counsel represented Taylor at trial. (Id. at 5)

Taylor argues that counsel's relationship with the Thomas family created a conflict of interest that adversely affected her performance in three ways. (Id., Ex. 24, at 23; id., Ex. 26, at 8-10) First, counsel did not move to exclude Channing and Yomika's identifications of Taylor as the shooter on the ground that law enforcement

used "suggestive photo lineup[s]." (Id., Ex. 24, at 1) Second, counsel failed to move for a judgment of acquittal. (Id. at 23) Third, counsel did not inform the jury that Trevoris allegedly testified against Taylor to seek the return of $5,000 he paid for a material witness bond. (Id., Ex. 26, at 8-10) As explained below, the bond was issued to secure Trevoris's appearance at trial. (Id., Ex. 27, Attachment 8)

"The Sixth Amendment guarantees the right to the assistance of a lawyer who is not laboring under an actual conflict of interest." Ochoa v. United States, 45 F.4th 1293, 1298 (11th Cir. 2022). To prevail on his conflict-of-interest claim, Taylor must show "(1) a conflict of interest that (2) adversely affected [counsel's] performance." Id. "To establish an adverse effect, [Taylor] must show some plausible alternative defense strategy or tactic that might have been pursued but for the alleged conflict—that is, [counsel's alleged] loyalty to [the Thomas family]." Id. To be "plausible," the alternative strategy or tactic must "possess sufficient substance to be a viable alternative." United States v. Williams, 902 F.3d 1328, 1332-33 (11th Cir. 2018).

The postconviction court rejected Taylor's conflict-of-interest claim. (Dkt. 8-2, Ex. 27, at 10-14) It held that, "[e]ven assuming an actual conflict of interest on [counsel's] part, . . . such conflict did not have an adverse effect upon her representation of [Taylor]." (Id. at 10) As explained below, this ruling was not "so lacking in justification that there was an error well understood and comprehended in

existing law beyond any possibility of fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103. Thus, Taylor is not entitled to relief.[7]

### 1.    Failure to Object to Photo Lineups

The postconviction court began by addressing counsel's failure to "object to law enforcement's use of suggestive photo array lineups with witnesses Channing [ ] and Yomika." (Dkt. 8-2, Ex. 27, at 10) According to Taylor, "the lineups were suggestive [because] the five other men depicted had large, bulging eyes and the photo of [Taylor] ha[d] 'small squinty eyes.'" (<u>Id.</u> at 10-11) The court noted that the lead detective, "through whom the two photo lineups were admitted, testified that both Channing [ ] and Yomika [ ] identified [Taylor] as the shooter even before viewing the photo lineups." (<u>Id.</u> at 11) This was "consistent with Channing [ ] and Yomika['s] [ ] testimony that [Taylor] was well known to them before the shooting incidents." (<u>Id.</u>) Thus, the court explained, "the identity of the shooter in this case was not at issue in the sense that a stranger to the witnesses shot the firearm and a photo lineup was necessary to identify a suspect." (<u>Id.</u>) To the contrary, "[t]he witnesses already knew

---

[7] The postconviction court correctly required Taylor to show that counsel's conflicts adversely affected her performance. The trial court did not conduct any investigation of the conflicts identified at the pretrial hearing. The failure to "investigate a conflict" requires "automatic reversal . . . *only* where defense counsel is *forced to represent codefendants* over his timely objection, unless the trial court has determined that there is no conflict." <u>Dallas v. Warden</u>, 964 F.3d 1285, 1303 (11th Cir. 2020) (emphasis in original; citation omitted). "[W]here a trial court fails to adequately investigate any other type of conflict that it knows or reasonably should know about, reversal is only warranted if the petitioner shows an actual conflict that negatively affected his attorney's performance." <u>Id.</u> at 1303-04. Here, counsel did not jointly represent codefendants. Given "the absence of the joint representation of codefendants, the appropriate legal standard . . . require[d] a showing that an actual conflict of interest adversely affected defense counsel's performance." <u>Id.</u> at 1303.

[Taylor]." (Id.) As a result, the "photo lineups were superfluous," and counsel's failure to object did not establish that her performance was adversely affected. (Id.)

This ruling was reasonable. Even assuming the identification procedure was unduly suggestive, counsel had no basis to seek suppression of the identifications. The constitution imposes "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." Perry v. New Hampshire, 565 U.S. 228, 232 (2012). "Out-of-court identifications are examined for due process violations using a two-part test: The court must first decide whether the [procedure] was impermissibly suggestive, and if it was suggestive the court must then determine whether the identification procedure created a substantial likelihood of misidentification." United States v. Smith, 459 F.3d 1276, 1294 (11th Cir. 2006). Even if an identification procedure was unduly suggestive, exclusion is not required if, "under the totality of the circumstances, the identification was nonetheless reliable." United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001).

Here, the identifications were "reliable" because they had a well-founded "independent source"—Channing and Yomika knew Taylor well, and both identified him as the culprit *before* they were shown the photo lineups. United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984). As the lead detective explained, Channing and Yomika "named Mr. Taylor by his nickname prior to us even showing them the lineup. They knew who he was." (Dkt. 8-2, Ex. 10, at 208) Because Channing and Yomika knew Taylor, they had a substantial "basis for making the identification"

independent of the photo lineups. Cannington, 729 F.2d at 711; see also United States v. Hefferon, 314 F.3d 211, 218-19 (5th Cir. 2002) (holding that "unduly suggestive" identification procedure did not require exclusion because the "out-of-court identification" had "[a] thread of reliability"—the witness "knew her assailant"). Thus, a motion to suppress the identifications was not a "plausible alternative defense strategy or tactic." Ochoa, 45 F.4th at 1298; see also United States v. Jean, 315 F. App'x 907, 912-13 (11th Cir. 2009) (identification based on single photograph was "reliable"—and therefore admissible—because witness had "spoke[n] with" suspect "face-to-face on at least two occasions").

### 2.    Failure to Seek Judgment of Acquittal

Next, the postconviction court addressed counsel's failure to "move for a judgment of acquittal." (Dkt. 8-2, Ex. 27, at 11) As the court explained, "[a] motion for judgment of acquittal tests the *sufficiency* of the evidence; a trial court must determine whether the evidence presented is legally adequate to permit a verdict." (Id. (citation omitted)) The court noted that "three eyewitnesses—Channing [ ], Yomika [ ], and Trevoris [ ]—testified during the State's case that [Taylor] was the shooter." (Id.) Taylor "assail[ed] the credibility of these witnesses, but the *weight* of the evidence" was irrelevant to "a motion for judgment of acquittal."[8] (Id.) The court concluded that,

---

[8] Under Florida law, "[m]otions for judgment of acquittal are decided under the sufficiency of the evidence standard, which examines whether the evidence presented is legally adequate to permit a conviction." Mitchell v. State, 245 So. 3d 805, 807 (Fla. 4th DCA 2018). By contrast, "[m]otions for a new trial are assessed under the weight of the evidence standard, which evaluates whether a greater amount of credible evidence supports an acquittal." Id. "If there is competent substantial evidence of each element of the crime and that the defendant was the perpetrator of that crime, the trial court

"[b]ecause the eyewitness testimony was legally adequate to permit a verdict, a motion for judgment of acquittal would have been unsuccessful." (Id.) As a result, counsel's "failure to move for judgment of acquittal did not have an adverse effect upon her representation of [Taylor]." (Id.)

This ruling was reasonable. "A motion for judgment of acquittal should be granted only when it is apparent that no legally sufficient evidence has been submitted under which a jury could find a verdict of guilty." Meme v. State, 72 So. 3d 254, 256 (Fla. 4th DCA 2011). Here, three eyewitnesses identified Taylor as the shooter. (Dkt. 8-2, Ex. 10, at 254, 280, 286, 328-31) This testimony was sufficient to support the convictions for second-degree murder and aggravated assault. See Peraza v. State, 767 So. 2d 605, 606 (Fla. 4th DCA 2000) (trial court "properly denied [ ] motion for judgment of acquittal" where "eyewitness testified that appellant struck his wife with a tool"). Moreover, "[a]ny argument regarding the weight of the evidence [did] not negate the competent evidence that was presented as to each element of the charged offenses." Williams v. State, 257 So. 3d 1192, 1197 (Fla. 1st DCA 2018). Because a motion for judgment of acquittal was doomed to fail, it was not a "plausible alternative defense strategy or tactic." Ochoa, 45 F.4th at 1298.

---

should deny a motion for judgment of acquittal, because it is the province of the jury to determine the weight of the evidence and the credibility of the witnesses." Wilkins v. State, 295 So. 3d 872, 876 (Fla. 5th DCA 2020).

### 3.    Failure to Adequately Address Material Witness Bond

Finally, the postconviction court addressed the argument that counsel's "conflict of interest caused her not to object or impeach Trevoris [ ] with the fact that he testified against [Taylor] in order to seek the return of $5,000 he paid for a material witness bond." (Dkt. 8-2, Ex. 27, at 11-12) Two months before trial, the prosecution moved to declare Trevoris a material witness. (Id., Attachment 7) According to the motion, Trevoris had informed the prosecution that "he would refuse to appear pursuant to" a subpoena ordering him to testify at trial. (Id.) The trial court granted the motion, committing Trevoris to the county jail but setting an appearance bond of $50,000 conditioned on his appearance at trial. (Id., Attachment 8) Later that day, Trevoris posted bond by paying a $5,000 premium to a bondsman. (Id., Attachment 9)

Trevoris testified at trial. On direct examination, he was asked whether he had received "any benefit, any gift, any money" to "come here and testify today." (Id., Ex. 10, at 244) He said, "No." (Id.) According to Taylor, counsel should have objected that this statement was false in light of the material witness bond. (Id., Ex. 26, at 6) After he finished testifying, Trevoris stepped down from the witness stand, approached the "defense table," and said, "[G]ive me back my five grand too." (Id., Ex. 10, at 267) Despite this outburst, the jury did not learn that Trevoris appeared at trial pursuant to a material witness bond. In Taylor's view, counsel should have elicited this fact to show that Trevoris's "true motive" for testifying was to secure the return of his $5,000. (Id., Ex. 26, at 9)

The postconviction court held that counsel "did not perform deficiently with regard to Trevoris['s] material witness bond premium." (Id., Ex. 27, at 14) According to the court, Trevoris testified truthfully when he denied receiving any "benefit" in exchange for his testimony. (Id. at 13) As the court explained, "[f]ar from a benefit, gift, or money received, Trevoris [ ] had *paid* a $5,000 premium in order to be released from county jail before [Taylor's] trial was completed." (Id.) Furthermore, the court "interpret[ed]" Trevoris's "parting comment"—"give me back my five grand"—as "a statement of his frustration rather than a confession of motive for his testifying as a State witness." (Id. at 14) Indeed, "the premium paid to the bondsman was a financial transaction between Trevoris [ ] and the bondsman to which neither the State Attorney, the Public Defender, nor the [trial court] was a party." (Id. at 13) Thus, "[a]ny recourse for his possibly recovering the premium amount required that Trevoris [ ] deal with directly with the bondsman and not the State Attorney or the Public Defender." (Id. at 13-14) For these reasons, counsel's "performance did not have an adverse effect upon her representation of" Taylor. (Id. at 14)

The postconviction court reasonably found no adverse effect. Counsel had no basis to object to Trevoris's statement that he did not receive any "benefit, . . . gift, [or] money" in exchange for testifying at trial. (Dkt. 8-2, Ex. 10, at 244) Trevoris was not paid to testify. To the contrary, he was declared a material witness, arrested, and forced to pay a $5,000 bond premium to secure his release until he appeared at trial. (Id., Ex. 27, Attachments 7-9) Thus, as the postconviction court explained, Trevoris made "a

true statement" when he denied receiving any benefit for his testimony. (Id., Ex. 27, at 13)

Furthermore, informing the jury about the material witness bond was not a "plausible alternative defense strategy or tactic." Ochoa, 45 F.4th at 1298. The bond required Trevoris's presence at trial, but it did not mandate that he testify in any particular manner. (Dkt. 8-2, Ex. 27, Attachment 9) Additionally, Taylor does not dispute that "[a]ny recourse for [ ] possibly recovering the premium amount required that Trevoris [ ] deal with directly with the bondsman and not the State Attorney or the Public Defender." (Id., Ex. 27, at 13-14) Any such recovery from the bondsman would have been unlikely because the bond's "Certificate of Discharge" stated that the "bond premium is non-refundable." (Id., Attachment 9) Moreover, there is no evidence that the State agreed to reimburse Trevoris for the premium. Thus, counsel could not plausibly argue that Trevoris's desire to recover the $5,000 motivated him to testify favorably to the State.

At most, the bond suggested that Trevoris was a reluctant witness. But the jury heard ample testimony about Trevoris's unwillingness to cooperate with law enforcement. For example, he acknowledged that he was "reluctant" to talk with the police, that he "didn't want to" cooperate, and that "the way [he] was raised, it wasn't settled like that." (Id., Ex. 10, at 258, 264) Counsel used this testimony to undermine Trevoris's credibility, arguing in closing that he "stated he didn't want to be there. He didn't want to participate. He didn't want to snitch on anyone, didn't want to point anyone out, and he had multiple opportunities to come forward and chose not to."

(Id. at 501) Because the jury "was already aware of [Trevoris's] reluctance to testify," any evidence about the material witness bond would have been "cumulative on the issue of motivation." Pruitt v. McAdory, 337 F.3d 921, 926 (7th Cir. 2003). Thus, a reasonable jurist could conclude that highlighting the bond was not a "plausible alternative defense strategy." Soto-Alvarez v. United States, 62 F.3d 1411 (1st Cir. 1995) (defendant "failed to show the existence of an alternative defense strategy" where "further cross-examination of the witnesses by counsel . . . would largely have been cumulative").

In short, "some fairminded jurists could agree with" the rejection of Taylor's conflict-of-interest claim. Hill v. Humphrey, 662 F.3d 1335, 1346 (11th Cir. 2011). Thus, "federal habeas relief must be denied." Id.

## IV.   CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Taylor's second amended petition for writ of habeas corpus, (Dkt. 13), is **DENIED**.

2. The Clerk is **DIRECTED** to enter judgment against Taylor and to **CLOSE** this case.

3. Because Taylor neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma*

*pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473,

478 (2000).

**DONE** and **ORDERED** in Tampa, Florida, this 21st day of August 2025.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE